UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| SHARON DAVISON D/B/A<br>SK DAVISON, | )<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | Case No.: 13-1507 |
| INTERNATIONAL BROTHERHOOD OF<br>TEAMSTERS, LOCAL UNION NO. 627, | )<br>)<br>) | |
| Defendant. | ) | |

# <u>O R D E R</u>

This matter is now before the Court on Defendant International Brotherhood of Teamsters, Local Union No. 627's ("Local 627") Motion for Summary Judgment [19]. This matter has been fully briefed. For the reasons set forth below, Defendant's Motion for Summary Judgment is DENIED.

### STATEMENT OF FACTS

The Morton Interchange Project ("Project") is a highway construction project at the intersection of I-155 and 74 in Morton, Illinois, located in Tazewell County. Fred Weber, Inc. ("Fred Weber" or "FWI") was the primary general contractor on the Project. The Project was covered by a Project Labor Agreement ("PLA") between the Illinois Department of Transportation ("IDOT") and other unions. Under Article 1.5 of the PLA, the applicable area collective agreement is the Articles of Construction Agreement between the Associated General Contractors of Illinois and the Illinois Conference of Teamsters ("AGC Agreement"). Fred Weber signed the AGC Agreement, but the agreement only applied to on-site work. Ed Walch ("Walch") was FWI's project manager for the Interchange Project and his responsibilities included working with FWI's team to coordinate the Project, administer subcontracts and

purchase orders, hold pre-construction meetings with contractors and unions, keep track of the budget, and serve as a point of contact for any labor grievances.

Around October or November 2012, Plaintiff Sharon Davison ("Sharon"), who does business as S.K. Davison ("SKD") learned about the Interchange Project from the IDOT's website. On October 31, 2013, SKD submitted a bid for various types of trucking services on the Interchange Project. The bid included hourly rates for non-covered workers, hourly rates for on-site work, which would be prevailing wage, a rate for on and off-site wet batch, and tonnage rates for material hauling. Based on SKD's bid, FWI created at DBE Participation Statement that indicated SKD would be performing $3,155,250.00 worth of labor on the Interchange Project; of that amount, $1.9 million worth of work would be on-site trucking work. In addition, to the on-site trucking work, SKD anticipated performing on-site mowing work. In the early part of 2013, Sharon or Ed Davison contacted Greg Wheet ("Wheet"), Local 627's Secretary-Treasurer, regarding the Interchange Project. The Davisons requested a sample copy of hauling agreements, but stated they would not sign Local 627's AGC Agreement.

Local 627 was informed early on that SKD would be performing both on-site and off-site work; but what was unclear, was the specific volume of off-site work SKD would perform. In March 2013, there was a pre-job meeting concerning the Interchange Project. Both Sharon and Ed were present; Wheet was present also. During the meeting, Wheet asked Sharon if SKD had a contract for trucking on the Project, to which she responded, "I don't have a contract on trucking." Ed Davidson told Local 627 that SKD would be performing "transportation" work. At the time of the pre-job meeting, Sharon anticipated performing on-site trucking work on the Interchange Project.

On April 5, 2013, Local 627 and the Davisons had a meeting to determine what work SKD would be performing on the Interchange Project. Wheet and Local 627's principal officer

Keith Gleason ("Gleason") were also in attendance. At that meeting, Gleason indicated if SKD planned on performing on-site trucking work it would need to sign a letter of assent and it would be bound by the AGC Agreement. The Davisons told Local 627 that SKD would perform trucking, which included both on-site and off-site work. Sharon also told Local 627 that SKD would sign the AGC Agreement if the union would make an amendment to the AGC Agreement that excused SKD from contributing to the Central States Pension fund. After the April 5th meeting, SKD decided to terminate the mowing contract and rescinded the Letter of Assent because they did not want to be subject to the PLA. Despite rescinding both the mowing contract and Letter of Assent, SKD still intended to perform on-site trucking work related to Interchange Project.

On April 10, 2013, Local 627 filed a grievance against FWI stating FWI was violating Articles 1.2, 1.5, and 1.5 of the PLA by allowing SKD to work on the Interchange Project without requiring SKD to sign a collective bargaining agreement, a letter of assent, or otherwise agree in writing to comply with the applicable agreements. The grievance did not specify that Local 627 was only concerned about SKD performing on-site work.

On April 16, 2013, a grievance meeting was held between Local 627 and FWI. Gleason and Hopkins were present for Local 627 and Walch and Kevin Wallis ("Wallis") were present for FWI. During the meeting, FWI indicated they would only use SKD for off-site work and no on-site work. During the meeting there was a disagreement about what was considered on-site versus off-site work; however, FWI assured Local 627 it would monitor the work being performed and ensure SKD would not perform on-site work. On April 16, 2013, Walch sent an e-mail to Sharon in which he indicated he was working with Local 627 to determine what type of hauling is acceptable without the hauling company signing the local union contract. Walch also wrote "the issue of being a subcontractor or not is playing a part in whether off site hauling is

3

allowable without a signed Teamster agreement." Walch Depo at 106:10-16, Plaintiff's Exhibit 15. As of April 16, 2013, Local 627 has not told Walch that SKD, as a non-signatory to its contract, could perform off-site work.

On April, 18, 2013, Walch asked Sharon to sign a letter indicating that SKD chose not to sign Local 627's agreement and therefore would be unable to perform the work as originally submitted. The letter also stated that the negotiations were still ongoing and Walch hoped to be able to use SKD as allowed by the project specification. As of April 18, 2013, Local 627 had not told Walch that FWI could use SKD for off-site work.

On April 25, 2013, Walch sent Gleason a Letter of Understanding stating "FWI plans to use Owner Operators signatory to Teamsters Local 627 or member of Local 627 in FWI or rental trucks to perform the following On Site (Covered) Hauling." Plaintiff's Exhibit 9. The letter also stated "FWI plans to use S.K. Davison tandems to perform the following Off Site (Non-Covered) Hauling." Id. On May 1, 2013, Gleason sent Walch a letter rejecting the Letter of Understanding. Specifically, the letter stated, "we have an issue with use of any hauler, including SKD, to perform working within the scope of the PLA or AGC Agreement without complying with such Agreements." Pl. Exh. 10. Walch understood this to mean Local 627 was requiring only union-represented employees be used to perform the off-site hauling work. The May 1, 2013 letter did not indicate that any company paying area standards could perform hauling work, regardless of whether they were a signatory to the union contract. At the time of the May 1, 2013 letter, the April grievance was still pending and was not specifically limited to on-site work by its terms. However, after FWI indicated it would not use SKD for on-site work, the Local 627 did not pursue its grievance, but rather held it in abeyance, which meant Local 627 reserved the right to bring it back up in the future and the grievance was not officially resolved.

4

SKD served as trucking broker for on-site work by arranging for owner-operators to perform on-site construction work. Serving as a trucking broker for on-site work was not a violation of the PLA or the ACG Agreement. On April 29, 2013 and April 30, 2013, SKD arranged for Local Boyzz Trucking to haul millings. FWI had a number of trucks on the Project and had the capacity to bring up its own trucks for off-site work; however, it would have not been economical as FWI would have to bring trucks from St. Louis where the company is based.

On May 7, 2013, Walch e-mailed Gleason confirming FWI would only use SKD for off-site work. On May 9, 2013, Local 627 filed a grievance against FWI stating "since May 7, 2013, FWI has been in violation of the agreement, in as much they have engaged a number of hauler [sic] to haul materials to the I-74 and I-155 Project in Morton. The work in question is covered under the Articles of Construction Agreement and requires that Qualified Drivers on Local Union 627's referral list be utilized to perform the work." The grievance considered both on-site and off-site work, but does not reference area standards. At the time of grievance Walch assumed that the grievance was covering off-site work because FWI had another company doing on-site work and the grievance specifically referenced haulers.

On May 13, 2013, Walch e-mailed Sharon and informed her that SKD could "not perform the work per standard practices without a grievance being filed against FWI." Walch Depo. at 120:21-121:6. As of May 13, 2013, Local 627 had not informed FWI that it could use SKD if they paid area standards. On May 14, 2013, Walsh ordered SKD to discontinue work on the Project. Walch testified had Local 627 not filed the April and May grievances he would have used SKD pursuant to the Utilization plan, which included both on-site and off-site work.

On May 15, 2013, Walch e-mailed the IDOT Small Business Enterprises office informing them that FWI attempted to negotiate an agreement between SKD and Local 627 to no avail and

as a result SKD would be unable to perform the work pursuant to the Utilization Plan, which covered both on-site and off-site work.

On May 22, 2013, Gleason, Wheet and Dean McCoy ("McCoy") from Local 627 met with Walch about the grievance. During the meeting, Gleason stated the grievance was solely based on FWI using material haulers who were not paying the area standard. During the May 22, 2013 meeting, the grievance was held in abeyance after FWI indicated it would no longer use Covenant, Local Boyzz, and SKD on the Project. Local 627 also requested that FWI review payroll for the contractors and provide the information to Local 627.

Following the May 22, 2013 meeting, Walch e-mailed other members of FWI informing them of what took place during the meeting. The e-mail specifically stated "the grievance purpose [is] to protect their standard" and "Off Site work does not have to be performed by a signatory company, but they have to meet the economic package." Pl. Exh. 22. The e-mail also stated Gleason indicated that SK Davison, Local Boyzz and Covenant were using employees to drive their trucks rather than having the owners themselves driving the trucks. Lastly, Walch stated, "They want records of what was being paid to those drivers. If those records show they are meeting the economic package things are looking better, but would not say ok. If no then that is where the making whole comes in." Id.

On May 24, 2013, Walch sent Sharon an e-mail in which he stated, "Teamsters contends that the whole economic package is less than established in the contract with FWI…If all of the trucks you had hauling meet the economic package then things are looking brighter." Def. Ex. 25. There were some questions about whether FWI would use SKD if she signed the letter of assent or the AGC Agreement and demonstrated she met the economic package for off-site hauling and obtained the appropriate agreement as Walch testified if SKD did the above things would look better, but not be okay. On May 29, 2013, Walch contacted SKD to obtain payroll

6

records. However, Ed Davison stated SKD would not turn over the payroll records because Walch was only requesting the information so he could turn it over to Local 627. It was Ed's understanding that if SKD turned over the payroll records, it was a possibility that SKD would be able to start working again. The Davisons refused to turn over the payroll records based on the advice of their attorney.

Walch also spoke to Sharon in May 2013 and explained to her that he needed SKD's payroll records to establish whether the business was paying the area standard. Sharon informed Walch that she would not be providing the payroll record to FWI and understood that failure to do so was one of the stated reasons why Walch could not put SKD back on the job. Walch was unable to respond to the May 9th grievance without they payroll records. Walch never requested Local Boyzz and Covenant's payroll records.

On May 17, 2013, Sharon filed a charge with National Labor Relations Board ("NLRB") asserting Local 627 violated § 8(b)(4)(ii)(B). In response to the charge, Local 627 submitted copies of the grievances, all written correspondence between FWI and Local 627, the PLA, and the AGC Agreement. On May 28, 2013, the NLRB dismissed the charge.

On June 14, 2013, SKD's counsel filed two additional charges, Case No. 25-CC-107038 and Case No. 25-CE-10742, with the NLRB. The charges alleged §8(e) and §8(b)(4) violations. On July 9, 2013, SKD withdrew Case No. 25-CC-107038. On July 10, 2013, the NLRB dismissed Case No. 25-CE-10742 finding that the evidence is insufficient to show that the Union unlawfully sought to apply the subcontracting provision of the CBA to off-site work. SKD appealed the dismissal of Case No. 25-CE-10742 to the NRLB's Office of General Counsel. On August 30, 2013, the General Counsel dismissed the appeal for substantially the same reasons stated in the July 10, 2013 decision stating, "The evidence establishes that Local 627's filing of a grievance under the contract between the AGC and the Illinois Conference Teamsters against

7

signatory Fred Weber Inc. was a colorable work preservation claim. The Union has a reasonable claim that the off-site drivers' work was unit work." On September 10, 2013, Sharon's counsel filed a motion for reconsideration with the Office of General Counsel, which was subsequently denied.

On September 18, 2013, Walch e-mailed Sharon in which he reiterated when SKD can show they had obtained the appropriate agreement with Local 627 and Local 627 can confirm that SKD met the requirements, he would meet with her to discuss SKD rejoining to the project.

On October 24, 2013, Plaintiff filed a one-count Complaint, amended on January 6, 2014, alleging Local 627 violated 29 U.S.C. § 303(a) by engaging in unfair labor practices of filing grievances against FWI with a secondary motive of forcing SKD to sign the ACG Agreement, which resulted in FWI ending their business relationship with SKD. On October 3, 2014, Local 627 moved for summary judgment.

## DISCUSSION

1. **Legal Standard**

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2552 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1355-56 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex Corp., 106 S. Ct. at 2553. This Court must then determine whether there is a need for trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. Anderson, 106 S. Ct. at 2511; Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

**2. Analysis**

**A.     Unlawful Interpretation of Contract Pursuant to §8(e)**

Local 627 first argues it is entitled to summary judgment because the grievances do not advance an interpretation of the ACG that violates § 8(e). Section 303 of the Labor Management Relations Act allows a plaintiff to obtain damages if a union engages in unfair labor practice as defined by the National Labor Relations Act ("NLRA"). See 29 U.S.C. § 187. Section 8(b)(4)(ii)(A) makes it unlawful for a union "to threaten, coerce, or restrain, any person…where in either case an objection thereof is (A) forcing or requiring any employer or self–employed person to join any labor or employer organization or to enter in to any agreement which is prohibited by subsection (e) or this section" or "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease business with any person…" 29 U.S.C. § 158(b)(4)(ii). In essence, a union cannot enter a "hot cargo" agreement with an employer in which the employer would be forced to cease doing business with a company who is not a member of the union. 29 U.S.C. § 158(b)(4)(ii)(A).

9

It is well-settled filing a grievance that asserts an unlawful interpretation of a Section 8(e) clause is considered coercive and therefore violates Section 8(b)(4). See Un. Bhd. of Carpenters and Joiners of Am. Local No 745, 312 N.L.R.B. 903, 904 (N.L.R.B. 1993); Local 27, Sheet Metal Workers Int'l Assoc. (AeroSonics, Inc.), 321 N.L.R.B. 540, (N.L.R.B. 1996); Int'l Union of Elevator Constructors (Long Elevator Machine Co., Inc.), 289 N.L.R.B. 1095 (N.L.R.B. 1988).

There were two grievances filed by Local 627 against FWI – an April 10, 2013 grievance and a May 9, 2013 grievance. The grievance at issue in this case is the one filed on May 9, 2013.

When the Interchange Project began SKD anticipated performing $3.1 million of work on the project. Of that, approximately $1.9 million was designated to be on-site work. The parties do not dispute that in order for SKD to perform on-site work they needed to be signatories to the collective bargaining agreement and bound by the PLA. It is also undisputed that Local 627's April 10, 2013 grievance was within the confines of the law as it related to on-site work. Specifically, Local 627 grieved FWI subcontracting work to SKD who had "neither agreed in writing to become bound by the terms of the PLA nor, to the extent required by the Agreement, signed the current applicable area collective bargaining agreement." Pl. Exh. 7.

On April 25, 2013, Walch wrote Gleason a letter informing him that "FWI plans to use S.K. Davison tandems to perform the following Off Site (Non-Covered) Hauling: Haul aggregate and crushed stone, from a supplier, to the project." Pl. Exh. 9. Local 627 lists this fact as disputed stating that they were "uncertain whether such work was accurately described as off-site work." Def. Reply ¶ 124. Local 627 was also unclear whether FWI was "accurately describing what work SKD would perform." Id.

Despite being informed that SKD would only be performing off-site work, on May 9, 2013 Local 627 filed a second grievance. The grievance expressly states, "Since on or about May

7, 2013 Fred Weber, Inc. has been in violation of the Agreement, in as much as they have engaged in a number of Haulers to haul materials to the I-74 and I 1-55 [sic]…The work in question is covered work under the Articles of Construction Agreement and requires Qualified divers on Local Union 627's referral list be utilized to perform this work." Docket Entry No. 26-16 at 2.

Local 627 argues the May 9th grievance was not filed in order to coerce subcontractors to be signatories to a collective bargaining agreement, but rather the grievance only sought to ensure SKD was paying area standards. Further Local 627 states there is no evidence the union advanced an interpretation of the agreement which would have required all off-site material haulers to be signatory to the AGC Agreement given that during a meeting on May 22, 2013, Gleason specifically stated the Union was not claiming all haulers would need to be union members to perform work. Local 627 concedes the hauling work in question was considered off-site, but argues SKD was not paying the area standards for the work. Plaintiff contends summary judgment is inappropriate because the plain reading of the May 9, 2013 grievance constitutes an unfair labor practice because the Union sought to restrict off-site trucking work to union-represented employees; thereby unlawfully attempting to coerce subcontractors to sign the AGC Agreement.

The Court finds Plaintiff has presented a genuine issue of material fact. Local 627 is correct that "Union standards' clauses, which provide that an employer may subcontract only to other employers whose wage and working standards are commensurate with those in the union's collective bargaining agreement, have been justified as serving to remove an incentive for the employer to contract out work done by union employees." George Ryan Co. v. NLRo. v. NLR, 609 F. 2d 1249, 1254 (7th Cir. 1979). Local 627 states it filed the May 9, 2013 grievance in order to ensure that subcontractors such as SKD were paying the standard wages; however, the

11

grievance itself does not support that assertion. Nowhere in the grievance does Local 627 reference the area standards, but rather focuses on the fact FWI was using non-signatories to the collective bargaining agreement to perform off-site hauling work. Walch informed Local 627 SKD would only perform off-site work. Local 627 later clarified what it meant by the grievance; however, that did not occur until thirteen days after the grievance was filed and after SKD had been removed from the Project. Local 627 did not amend or withdraw the grievance, but rather held it in abeyance, which meant Local 627 reserved the right to bring it back up in the future and the grievance was not officially resolved.

It is also undisputed Walch testified had Local 627 not filed the April and May grievances then FWI would have used SKD to complete the work on the Project under the Utilization Plan, which included off-site work. The record promotes a reasonable inference that Local 627 was attempting to assert an unlawful interpretation of the ACG Agreement to impose a union-signatory requirement for off-site work. A jury must decide whether Local 627 filed the grievance to coerce SKD into becoming a signatory to the Collective Bargaining Agreement or whether Local 627 was attempting to lawfully enforce area standards. Accordingly, Local 627's Motion for Summary Judgment must be denied.

**B.      Applicability of *Bill Johnson Restaurant v. NRLB*, 461 U.S. 731 (1983)**

Local 627's second argument is summary judgment is appropriate where Plaintiff failed to show the May 9, 2013 grievance was objectively baseless and a subjective illegal intent, and where Plaintiff has not alleged Local 627 is seeking to enforce an illegal contract provision. In support of their argument, Local 627 cites Bill Johnson Restaurant v. NRLB, in which the Supreme Court held that the specific contract provision sought to be enforced in the action must be one that constitutes an unfair labor practice under Section 8(b)(4)(ii)(A) of Act. 461 U.S. 731, 745 n. 11 (1983). See also, Truck Drivers, Union Local 705 v. NLRB, (Emery Air Freight), 820

F.2d. 448, 452 (D.C. Cir. 1987)(holding under Bill Johnson, that if the grievance had an unlawful objective, there must be a finding that the underlying contract provision itself must be illegal). Plaintiff argues Bill Johnson is inapplicable to this case because Local 627's legal action of filing a grievance is illegal under federal law. Bill Johnson, 461 U.S. 731, n. 5 (1983).

Local 627's argument requires the Court to make a finding that the May 9, 2013 grievance sought to enforce area standards. Plaintiff argues the plain language of the grievance makes no mention of the area standards, but rather states FWI must use union signatories to perform offsite hauling work; thereby creating an unlawful "hot cargo" agreement. This is an issue of fact that must be resolved by a jury.

This Court cannot make a finding as to Local 627 intent as summary judgment is typically inappropriate for resolving questions of a party's motive or intent; this is also question of fact for the jury. See Ashman v. Barrows, 438 F. 3d 781, 784 (7th Cir. 2006); Santiago v. Lane, 894 F.2d 218, 224 (7th Cir. 1990). Accordingly, Local 627's Motion for Summary Judgment must be denied.

**C.     Damages**

Local 627's final argument is Plaintiff failed to demonstrate a causal connection between the May 9, 2013 grievance and her loss of off-site hauling work. Plaintiff disputes this fact arguing SKD sustained damages, which is evidenced by Walch's testimony that had Local 627 not filed the April and May grievances then FWI have used SKD to complete the work on the Project under the Utilization Plan, which included off-site work.

To the extent Local 627 is arguing SKD sustained damages because they failed to provide their pay records, the Court finds that argument is more appropriate for a jury during trial as evidence Plaintiff failed to mitigate her damages and cannot be resolved at the summary judgment stage.

## CONCLUSION

For the reasons set forth above, Defendant International Brotherhood of Teamsters, Local Union No. 627's Motion for Summary Judgment [19] is DENIED. This matter remains set for Final Pretrial on March 6, 2015 and Jury Trial on April 13, 2015.

Entered this 20th day of February, 2015.

/s/ James E. Shadid
James E. Shadid
Chief United States District Judge